## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| STACEY NOLLEY & DANNY NGUYEN, *individually and on behalf of all others similarly situated*; | ) ) ) ) | **Civil Action No.:** 4:25-cv-254 <br><br> <u>**CLASS ACTION**</u> |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | |
| SOUTHEAST SERIES OF LOCKTON COMPANIES, LLC. and DOLLAR TREE, INC., | ) ) ) ) | <u>**DEMAND FOR JURY TRIAL**</u> |
| *Defendants*. | ) ) ) | |

<u>**ORIGINAL COMPLAINT—CLASS ACTION**</u>

Plaintiffs Stacey Nolley and Danny Nguyen ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated, sue Defendants Southeast Series of Lockton Companies, LLC., and Dollar Tree, Inc. ("Defendants"), to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendants. Plaintiffs make the following allegations upon information and belief, except as to his and/or her own actions, the investigation of his and her counsel, and the facts that are a matter of public record.

## I.    INTRODUCTION

1.    This class action arises out of the recent data security incident and data breach that was perpetrated against Defendants (the "Data Breach"), which held in their possession certain sensitive personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information"), of Defendants' current and former employees, the putative class members ("Class"). This Data Breach occurred On November 20, 2024.

2.      Defendant Southeast Series of Lockton Companies, LLC (individually referred to as "Defendant Lockton") is a company that provides its clients with human resource consulting services, including attracting and retaining talent, managing costs and promoting employee wellbeing; risk management, and industry consulting services. [1]

3.      Defendant Dollar Tree, Inc (individually referred to as "Defendant Dollar Tree") is a retailer that offers customers items from everyday essentials to fun craft, seasonal, and party merchandise.[2] Defendant Dollar Tree was a client of Defendant Lockton's where Defendant Lockton provided Defendant Dollar Tree's employee's their employee benefit services under Defendant Dollar Tree's Group Health & Benefit Plan offered to employees. [3]

4.      The Private Information compromised in the Data Breach included certain PII of Defendants' current and former employees, including the Plaintiffs'. This Private Information included but is not limited to "name and Social Security number, date of birth, and medical insurance information."[4]

5.      Defendants have reported to the Office of the Maine Attorney General that the total number of persons affected by the Data Breach was 1,893.[5]

6.      The Private Information was acquired by cyber-criminals who perpetrated the attack and remains in the hands of those cyber-criminals.

---

[1]  Lockton, Products & Services, People Solutions: available at : https://global.lockton.com/us/en/products-services/people-solutions (last visited April 7, 2025)
[2] Dollar Tree, Inc., Our Brands, Dollar Tree: available at: https://corporate.dollartree.com/about/our-brands/dollar-tree (last visited April 7, 2025).
[3] *See* Notice of Security Incident (Exhibit A)
[4] *Id*.
[5] Office of the Maine Attorney General, Consumer Information, Privacy, Identity Theft and Data Security Breaches, Data Breach Notifications: available at: https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/08800cf9-9172-4984-a724-ede0328d5a42.html (last visited April 7, 2025).

7.     The Data Breach resulted from Defendants' failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect individuals' Private Information with which they were entrusted.

8.     Plaintiffs bring this class action lawsuit on behalf of those similarly situated to address Defendants' inadequate safeguarding of the Plaintiffs' and Class Members' Private Information that it collected and maintained; and for failing to provide timely and adequate notice to Plaintiffs and Class Members that their information was subjected to unauthorized access by an unknown third party and precisely what specific type of information was accessed.

9.     Defendant Lockton maintained the Private Information on behalf of Defendant Dollar Tree in a reckless manner. In particular, the Private Information was maintained on Defendants' computer networks in conditions vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendants, and thus Defendants were on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

10.     Defendants, through their employees, disregarded the rights of the Plaintiffs and the Class Members (defined below) by, among other things, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions.

11.     Defendants also failed to disclose that they did not have adequately robust computer systems and security practices to safeguard the Plaintiffs' and Class Members' Private Information and failed to take standard and reasonably available steps to prevent the Data Breach.

12. In addition, Defendant. Lockton's employees failed to properly monitor the computer network and systems that housed the Defendant Dollar Tree's employee's Private Information. Had Defendants' employees (presumably in the IT department) properly monitored their property, they would have discovered the intrusion sooner.

13. Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendants collected and maintained is now in the hands of data thieves.

14. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes. These crimes include opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, filing false medical claims using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

15. Because of the Data Breach, the Plaintiffs and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

16. Plaintiffs and Class Members may also incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

17. Through this Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

18.     Plaintiffs seek remedies including, but not limited to, compensatory damages, punitive damages, nominal damages, restitution, injunctive and declaratory relief, reasonable attorneys' fees and costs, and all other remedies this Court deems just and proper.

19.     Accordingly, Plaintiffs sue Defendants seeking redress for their unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence per se, (iii) breach of implied contract; (iv) breach of third-party beneficiary contract, (v) invasion of privacy/intrusion upon seclusion, and (vi) unjust enrichment

## II.     PARTIES

20.     Plaintiff Stacey Nolley is and at all times mentioned herein was individual citizen of Texas, residing in the city of Jacksonville.

21.     Plaintiff Danny Nguyen is and at all time mentioned herein was an individual citizen of Texas, residing in the city of Jacksonville.

22.     Plaintiff Danny Nguyen and Plaintiff Stacey Nolley are husband and wife but were both victims of the Data Breach.

23.     Plaintiffs provided their trusted Private Information, including PII and PHI, to Defendant Dollar Tree in order to obtain employee benefit services under the Dollar Tree, Inc., Group Health & Welfare Benefit Plan ("the Plan") provided by Defendant Lockton in the ordinary course of business.

24.     Plaintiffs received notice of the Data Breach on and around March 28, 2025, informing them that their sensitive information was part of Defendants' Data Breach. See Exhibit A.

25.     Defendant Southeast Series of Lockton Companies, LLC (individually referred to as "Defendant Lockton") is a subseries company of Lockton Companies which is an international

company that provides its clients with human resources consulting, risk management consulting, and industry consulting services. [6]

26.     Defendant Lockton is headquartered in Missouri and has its principal place of business located at 12747 Olive Boulevard, #300 St. Louis, Missouri 63141.[7] Defendants maintain its "global headquarters" at 444 W 47th St., Suite 900, Kansas City, MO 6411.

27.     It's registered agent is Corporate Creations Network Inc. and can be served at the same address, 12747 Olive Boulevard, #300 St. Louis, Missouri 63141.[8]

28.     Defendant Dollar Tree, Inc. is a Virginia Corporation with its principal place of business located at 500 Volvo Pkwy., Chesapeake, Virginia 23320.

29.     It's registered agent is Wally Jones, U.S. Bank National Association, 333 Commerce Street, Suite 801, Nashville, Tennessee 37201.

## III.     JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). There are at least 100 putative Class Members, the aggregated claims of the individual Class Members exceed the sum or value of $5,000,000 exclusive of interest and costs, and members of the proposed Class, including Plaintiff, are citizens of states different from Defendants, as the Data Breach affected Class Members in multiple states.

---

[6] Lockton, Products & Services, People Solutions: available at : https://global.lockton.com/us/en/products-services/people-solutions (last visited April 7, 2025)
[7] Missouri Secretary of State, Business Entity Records, available at:
https://bsd.sos.mo.gov/BusinessEntity/BusinessEntityDetail.aspx?ID=4009183&page=beSearch (Last visited April 7, 2025).
[8] *Id.*

31.     This Court has personal jurisdiction over Defendants because Defendant Lockton's principal place of business is in Missouri and both Defendants engaged in substantial activity in Missouri.

32.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1)-(d) because Defendant Lockton's principal place of business is located in this District and a substantial part of the events and omissions giving rise to this action in this District.

## IV.    FACTUAL ALLEGATIONS

A.    **DEFENDANTS' BUSINESS**

33.     Defendant Lockton is a company that provides employee benefits, insurance, and risk management consulting services.

34.     Defendant Dollar Tree is a client of Defendant Lockton that offered Defendant Lockton's employee-benefit management services to its employees via it's Group Health & Welfare Benefit Plan.

35.     In the ordinary course of business, and in order to gain profits, Defendants requires Plaintiffs and Class members to provide (and Plaintiffs did provide) Defendants with sensitive, personal, and private information, such as his or her:

    a.     Name;
    b.     Social Security number;
    c.     date of birth and
    d.      medical insurance information.

36.     All of Defendants' employees, staff, entities, sites, and locations may share employee member protected health information with each other for various purposes, as should be disclosed in a HIPAA compliant privacy notice ("Privacy Policy") that Defendants are required to maintain.

37.     Upon information and belief, Defendants' HIPAA Privacy Policy is provided to every employee prior to receiving insurance benefits, and upon request.

38.     Defendants agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiffs and Class Members, safely, confidentially, and in compliance with all applicable contractual obligations, laws, regulations including the Health Insurance Portability and Accountability Act ("HIPAA"), and common law.

39.     The employee's protected health and personal information held by Defendants in their computer systems and networks included the Private Information of Plaintiffs and Class Members.

B.     **THE DATA BREACH**

40.     A Data Breach typically occurs when cyber criminals who intend to and successfully act to access and steal Private Information that has not been adequately secured by business entities like Defendant.

41.     The Cyber Security Incident Notice published on March 7, 2025 via the Maine Office of Attorney General's website stated in part:

> **What Happened?**
> On November 20, 2024, Lockton discovered suspicious activity on a single Lockton computer. Lockton immediately began an investigation, engaged third-party cybersecurity experts, and notified law enforcement. The investigation found that an unauthorized party accessed a single individual account and computer within the Lockton environment and obtained certain files on November 20, 2024. Lockton then conducted a robust review of th3e files to identify individuals whose personal information may have been contained within the files. Upon completion of the review, on February 5, 2025, Lockton began notifying clients of this incident, and Lockton is notifying you on its client's behalf.[9]

---

[9] AODFCU, *Cyber Security Incident Notice, available at*: https://www.aodfcu.com/wp-content/uploads/2025/03/ADFCU-Website-Notice35665417.1.pdf (last visited April 7, 2025)

42.     The U.S. Department of Health and Human Services requires, "[i]f a breach of unsecured protected health information affects *500 or more individuals*, a covered entity must notify the Secretary of the breach without unreasonable delay and in *no case later than 60 calendar days* from the discovery of the breach."[10] Further, if "the number of individuals affected by a breach is uncertain at the time of submission, the covered entity should provide an estimate," and later provide an addendum or correction to HHS.[11]

43.     Defendants cannot claim they were unaware of the HHS notification requirements as they complied (at least in part) with those requirements.

44.     Plaintiffs' notice letter was dated March 28, 2025 —more than three months after Defendants discovered the Data Breach.

45.     Defendants had obligations created by HIPAA, contract, industry standards, state law, common law, and representations made to Plaintiffs and Class Members, to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

46.     Plaintiffs and Class Members provided their Private Information to Defendants with the reasonable expectation and mutual understanding that Defendants would comply with their obligations to keep such information confidential and secure from unauthorized access.

47.     Defendants' data security obligations were particularly important given the substantial increase in Data Breaches targeting personal identifying and protected health information preceding the date of the breach.

---

[10] U.S. Department of Health and Human Services, *Submitting Notice of a Breach to the Secretary* (Feb. 27, 2023) https://www.hhs.gov/hipaa/for-professionals/breach-notification/breach-reporting/index.html (last viewed April 8, 2025).
[11] *Id*.

48.     In 2023, a record 3,205 data breaches occurred, resulting in around 353,027,892 individuals' information being compromised, a 78% increase from 2022.[12] Of the 2023 recorded data breaches, 809 of them, or 25% were in the medical or healthcare industry.[13] The 809 reported breaches reported in 2023 exposed nearly 56 million sensitive records, compared to only 343 breach that exposed just over 28 million sensitive records in 2022. [14]

49.     Data Breaches such as the one experienced by Defendants have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack.

50.     In fact, according to the cybersecurity firm Mimecase, 90% of health care organization experienced cyberattacks in the past year.[15]

51.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public, including Defendants.

C.     **DATA BREACHES ARE PREVENTABLE**

52.     Defendants failed to use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

53.     Defendants could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing Private Information.

---

[12] *See* Identity Theft Resource Center, *2023 Data Breach Report* (January2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited April 8, 2025).
[13] *Id*.
[14] *Id*. at 11, Fig. 3.
[15] Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack, Security Magazine* (Nov. 23, 2020), *available at* https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited April 8, 2025).

54.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[16]

55.     To prevent and detect cyber-attacks and/or ransomware attacks, Defendants could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.
- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.
- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.
- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.
- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.
- Consider disabling Remote Desktop protocol (RDP) if it is not being used.
- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

---

[16] How to Protect Your Networks from RANSOMWARE, at 3, available at: https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last visited April 8, 2025).

- Execute operating system environments or specific programs in a virtualized environment.
- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[17]

56.    To prevent and detect cyber-attacks or ransomware attacks, Defendants could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure Internet-Facing Assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**
- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**
- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**
- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**
- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event LogsAnalyze logon events;

**Harden infrastructure**
- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[18]

---

[17] *Id.* at 3-4.
[18] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last viewed April 8, 2025).

57. Given that Defendants were storing the Private Information of Defendant Dollar Tree's current and former employees, Defendant could and should have implemented all the above measures to prevent and detect cyberattacks.

58. The occurrence of the Data Breach indicates that Defendants failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and data thieves acquiring and accessing the Private Information of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiffs and Class Members.

D. **DEFENDANTS ACQUIRE, COLLECT & STORE EMPLOYEES' PRIVATE INFORMATION**

59. In its ordinary course of business Defendant Lockton acquires, collects, and stores a massive amount of Private Information on its clients current and former employees.

60. As a condition of becoming an employee of Defendant Dollar Tree's and receiving employee benefits under the Group Health & Welfare Benefit Plan from Defendant Lockton, employees are required to entrust Defendants with highly sensitive personal information

61. By obtaining, collecting, and using Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

62. Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and would not have entrusted it to Defendants absent a promise to safeguard that information.

63. Upon information and belief, while collecting Private Information from employees, including Plaintiffs, Defendants promised to provide confidentiality and adequate security for their

data through their applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

64.     Plaintiffs and the Class Members relied on Defendants to keep their Private Information confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

### E.     VALUE OF PRIVATE INFORMATION

65.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[19] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[20]

66.     The PII/PHI of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[21] For example, Personal Information can be sold at a price ranging from $40

---

[19] 17 C.F.R. § 248.201 (2013).
[20] *Id.*
[21] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last viewed April 8, 2025)

to $200.[22] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[23]

67.     Theft of PHI is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[24]

68.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

69.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[25]

70.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

---

[22] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last viewed April 8, 2025)
[23] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last viewed April 8, 2025)
[24] Medical I.D. Theft, EFraudPrevention, available at https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20your,credit%20report%20may%20be%20affected. (last visited April 8, 2025).
[25] *Report to Congressional Requesters, GAO, at 29 (June 2007), available at*: https://www.gao.gov/assets/gao-07-737.pdf

## F.    DEFENDANTS FAIL TO COMPLY WITH FTC GUIDELINES

71.    The Federal Trade Commission ("FTC") has promulgated many guides for businesses which show how important it is to implement reasonable data security practices. According to the FTC, the need for data security should shape all business decision-making.

72.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal Private Information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[26] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor incoming traffic for activity suggesting someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[27]

73.    The FTC further recommends that companies not maintain PII or PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

74.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect financial and health insurance data, by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential

---

[26] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (2016), *available at* www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf    (last visited March 26, 2025).
[27] *Id.*

data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions also clarify the measures businesses must take to meet their data security obligations.

75. These FTC enforcement actions include actions against defendants that failed to properly implement basic data security practices.

76. The Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to members' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Defendants were always fully aware of the obligation to protect the PII and PHI of the employees. Defendants were also aware of the significant repercussions that would result from its failure to do so.

## G.   DEFENDANTS FAIL TO COMPLY WITH INDUSTRY STANDARDS

77. As shown above, experts studying cyber security routinely identify health insurance providers like Defendant Lockton, that maintain PII and PHI data as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

78. Several best practices have been identified that at a minimum should be implemented by corporations and insurance providers like Defendants, including, but not limited to, educating all employees; using strong passwords; creating multi-layer security, including firewalls, antivirus, and anti- malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data; and limiting which employees can access sensitive data.

79. Other best cybersecurity practices that are standard in the insurance industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such

as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

80. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

81. These foregoing frameworks are existing and applicable industry standards, and Defendants failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

## H. Defendants' Conduct Violates HIPAA and Reveals Its Insufficient Data Security

82. HIPAA requires covered entities such as Defendants to protect against reasonably anticipated threats to the security of sensitive member health insurance information.

83. Covered entities must implement safeguards to ensure the confidentiality, integrity and availability of PHI. Safeguards must include physical, technical, and administrative components.

84. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq.* These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI like the data Defendants left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA.

These rules include: 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. §164.312(a)(1); 45 C.F.R. § 164.308(A)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D); and 45 C.F.R. § 164.530(b).

85.     A Data Breach such as the one Defendants experienced is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule. *See* 45 C.F.R. 164.402 (Defining "Breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under [the HIPAA Privacy Rule] which compromises the security or privacy of the protected health information.")

86.     Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate it failed to meet standards mandated by HIPAA regulations.

## V.     DEFENDANTS' BREACH

87.     Defendants breached their obligations to Plaintiffs and Class Members and/or were otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its data. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

    b.    Failing to adequately protect employees' Private Information;

    c.    Failing to properly monitor its own data security systems for existing intrusions;

    d.    Failing to ensure that vendors with access to Defendants' protected health data employed reasonable security procedures;

    e.    Failing to ensure the confidentiality and integrity of electronic PHI they created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

    f.    Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

    g.    Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h.   Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i.   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(3);

j.   Failing to ensure compliance with HIPAA security standard rules by Defendants' workforce in violation of 45 C.F.R. § 164.306(a)(4);

k.   Failing to train all members of Defendants' workforces effectively on the policies and procedures about PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

l.   Filing to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as they had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 C.F.R. § 164.304, definition of "encryption")

m.   Failing to put into place proper procedures, software settings, and data security software protections to adequately protect against a blunt force intrusion;

n.   Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act;

o.   Failing to adhere to industry standards for cybersecurity; and

p.    Failing to provide notice once the scope of the breach was determined.

88.   As the result of computer systems needing security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

89.   As the result of computer systems needing security upgrading, Defendants negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

90.   Accordingly, as outlined below, Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

A.   **PLAINTIFFS AND THE CLASS MEMBERS HAVE AND WILL EXPERIENCE SUBSTANTIAL HARM IN THE FORM OF RISK OF CONTINUED IDENTITY THEFT.**

91.     Plaintiffs and members of the proposed Class have suffered injury from the misuse of their PII and PHI that can be directly traced to Defendants.

92.     The ramifications of Defendants' failure to keep Plaintiffs' and the Class's PII and PHI secure are severe.

93.     Identity theft occurs when someone uses another's personal information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes. According to experts, one out of four data breach notification recipients become a victim of identity fraud.

94.     Because of Defendants' failures in preventing—and timely detecting—the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

   a.    The loss of the opportunity to control how their PII is used;
   b.    The diminution in value of their PII;
   c.    The compromise and continuing publication of their PII;
   d.    Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;
   e.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;
   f.    Delay in receipt of tax refund monies; Unauthorized use of stolen PII; and
   g.    The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the PII in its possession.

95.     Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

96.     The value of Plaintiffs' and the proposed Class Member's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals often post stolen Private Information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

97.     It can take victims years to spot identity, PII or PHI theft, giving criminals plenty of time to abuse that information for money.

98.     One such example of criminals using PII for profit is the development of "Fullz" packages.

99.     Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

100.    The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and other members of the proposed Class's stolen PII is being misused, and that such misuse is traceable to the Data Breach.

101. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims, and the numbers are only rising.

102. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good" but Defendants did not rapidly report to Plaintiffs and the Class that their PII and/or PHI had been stolen.

103. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

104. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their PII and PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

105. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiffs and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

106. The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and

amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[28]

107.    The FTC has also issued many guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires:

      a.    encrypting information stored on computer networks;
      b.    retaining payment card information only as long as necessary;
      c.    properly disposing of personal information that is no longer needed;
      d.    limiting administrative access to business systems;
      e.    using industry-tested and accepted methods for securing data;
      f.    monitoring activity on networks to uncover unapproved activity;
      g.    verifying that privacy and security features function properly;
      h.    testing for common vulnerabilities; and
      i.    updating and patching third-party software.

108.    According to the FTC, unauthorized PII disclosures ravage consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[29] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

109.    Defendants' failure to properly notify Plaintiffs and Class Members of the Data Breach has exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and PHI, and take other necessary steps to mitigate the harm caused by the Data Breach.

110.    Plaintiffs and Class Members now face an increased risk of fraud and identity theft.

---

[28] Statement of FTC Commissioner Pamela Jones Harbour-Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009).
[29] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012), *available at* https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last visited April 9, 2025).

**B.**    **DATA BREACHES PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTITY THEFT**

111.   Data Breaches such as the one experienced by Defendants' are especially problematic because of the disruption they cause to the daily lives of victims affected by the attack.

112.   The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[30]

113.   The FTC recommends that identity theft victims take several steps to protect their personal financial and health information after a data breach, including contacting one of the credit bureaus to place a fraud alert (possibly an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[31]

114.   Identity thieves use stolen personal information such as Social Security numbers for various crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

115.  Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give

---

[30] U.S. Government Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), *available at* https://www.gao.gov/new.items/d07737.pdf (last visited April 9, 2025) ("GAO Report").
[31] Federal Trade Commission, *What To Do Right Away* (2024), *available at* https://www.identitytheft.gov/Steps (last visited April 8, 2025).

the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

116. Theft of Private Information is gravely serious because PII/PHI is a valuable property right.[32]

117. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

118. Theft of PHI is also gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected." Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves.

119. It must also be noted there may be a substantial time lag—measured in years—between when harm occurs versus when it is discovered, and between when Private Information and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which studied data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[32] *See, e.g.,* John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

See GAO Report, at p. 29.

120. Private Information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

121. There is a strong probability that all the stolen information has been or will be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

122. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[33] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

123. For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for more credit lines.[34] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[35] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual employer

---

[33] Ashiq Ja, *Hackers Selling [healthcare] Data in the Black Market*, InfoSec (July 27, 2015), *available at* https://resources.infosecinstitute.com/topic/hackers-selling-[healthcare]-data-in-the-black-market/ (last visited April 8, 2025).
[34] Social Security Administration, *Identity Theft and Your Social Security Number* (2018), *available at* https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited April 8, 2025).
[35] *Id* at 4.

of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

124. It is also hard to change or cancel a stolen Social Security number.

125. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[36]

126. Healthcare data, as one would expect, demands a much higher price on the black market. The National Association of Healthcare Access Management reports,"[p]ersonal medical data is said to be more than ten times as valuable as credit card information."[37]

127. Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, coveted Social Security numbers were selling on the dark web for just $1 in 2016—the same as a Facebook account. That pales in comparison with the asking price for medical data, which was selling for $300 and up.[38]

128. In recent years, the corporations that maintain health and financial data in their network systems have experienced disproportionally higher numbers of data theft events than other industries. Defendants therefore knew or should have known this and strengthened its data systems

---

[36] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (February 9, 2015), *available at* http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying- about-identity-theft (last visited April 8, 2025).

[37] Laurie Zabel, *The Value of Personal Medical Information: Protecting Against Data Breaches*, NAHAM Connections, *available at* https://www.naham.org/page/ConnectionsThe-Value-of-Personal-Medical-Information (last visited April 3, 2025).

[38] Paul Ducklin, *FBI "ransomware warning" for healthcare is a warning for everyone!*, Sophos (Oct. 29, 2020) *available at* https://news.sophos.com/en-us/2020/10/29/fbi-ransomware-warning-for-healthcare-is-a-warning-for- everyone/ (last visited April 3, 2025).

accordingly. Defendants were put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## VI.    PLAINTIFFS' EXPERIENCE

A. **Plaintiff Stacey Nolley's Experience**

129.  Plaintiff Stacey Nolley is and at all times mentioned herein was an individual citizen of Texas, residing in the city of Jacksonville.

130.  Plaintiff provided Defendant Dollar Tree with her sensitive PII and PHI as an employee receiving employee benefits from Defendant Lockton.

131.  Plaintiff was an employee Of Defendant Dollar Tree for one and a half years and was on Defendant Lockton's Group Health & Welfare Benefit Plan for six months.

132.    On March 28, 2025, Defendants mailed Plaintiff a Notice confirming her name, Social Security number, date of birth, medical insurance information were accessed by the unauthorized intruders.[39]

133.  Plaintiff stores any documents containing her sensitive Private Information in a safe and secure location or destroys the documents.

134.  Moreover, Plaintiff diligently chooses unique usernames and passwords for her sensitive online accounts.

135.  Had Plaintiff been aware that Defendants' computer systems were not secure, she would not have entrusted her personal data to Defendants.

136.  Because of the Data Breach, Defendants have advised Plaintiff to take certain steps to protect her Private Information and otherwise mitigate her damages.

---

[39] *See* Notice of Security Incident, (Exhibit A)

137.  Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring her accounts to track any fraudulent activity that has occurred and the time it has taken to rectify the fraudulent activity.

138.  This time has been lost forever and cannot be recaptured. This time was spent at Defendants' direction by way of the Data Breach notice where Defendant recommended that Plaintiff mitigate her damages by, among other things, monitoring her accounts for fraudulent activity.

139.  Even with the best response, the harm caused to Plaintiff cannot be undone.

140.  Plaintiff suffered actual injury in the form of damages and diminution to the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and because of the Data Breach.

141.  Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has constant anxiety and increased concerns for the loss of her privacy.

142.  Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

143.  Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected, and safeguarded from future breaches.

B. **Plaintiff Danny Nguyen's Experience**

144.  Plaintiff Danny Nguyen is and at all times mentioned herein was an individual citizen of Texas, residing in the city of Jacksonville.

145. Plaintiff provided Defendant Dollar Tree with his sensitive PII as an employee of Defendant Dollar Tree in order to receive employee benefits from Defendant Lockton as part of the Group Health & Welfare Benefit Plan.

146. Plaintiff Nguyen was employed by Defendant Dollar Tree for about one year and was on the Group Health & Welfare Benefit Plan for the duration of his employment.

147. On March 28, 2025, Defendants mailed Plaintiff a Notice confirming her name, Social Security number, date of birth, medical insurance information were accessed by the unauthorized intruders.[40]

148. Plaintiff stores any documents containing his sensitive Private Information in a safe and secure location or destroys the documents.

149. Moreover, Plaintiff diligently chooses unique usernames and passwords for his sensitive online accounts.

150. Had Plaintiff been aware that Defendants' computer systems were not secure, he would not have entrusted his personal data to Defendant.

151. Because of the Data Breach, Defendants have advised Plaintiff to take certain steps to protect his Private Information and otherwise mitigate his damages.

152. Because of the Data Breach, Plaintiff spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach and self-monitoring his accounts to track any fraudulent activity that has occurred and the time it has taken to rectify the fraudulent activity.

153. This time has been lost forever and cannot be recaptured. This time was spent at Defendants' direction by way of the Data Breach notice where Defendants recommended that

---

[40] *See* Notice of Security Incident, (Exhibit A)

Plaintiff mitigate his damages by, among other things, monitoring his accounts for fraudulent activity.

154. Even with the best response, the harm caused to Plaintiff cannot be undone.

155. Plaintiff suffered actual injury in the form of damages and diminution to the value of Plaintiff's Private Information—a form of intangible property that Plaintiff entrusted to Defendants, which was compromised in and because of the Data Breach.

156. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has constant anxiety and increased concerns for the loss of his privacy.

157. Plaintiff has suffered imminent and impending injury arising from the exacerbated risk of fraud, identity theft, and misuse resulting from their Private Information being placed in the hands of criminals.

158. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in Defendant's possession, is protected, and safeguarded from future breaches.

## VII. PLAINTIFFS' AND CLASS MEMBERS' DAMAGES

159. To date, Defendants have done little to provide Plaintiffs and Class Members with relief for the damages they have suffered because of the Data Breach, including, but not limited to, the costs and loss of time they incurred because of the Data Breach. Defendant has only offered 24 months of inadequate identity monitoring services, despite Plaintiffs and Class Members being at risk of identity theft and fraud for the remainder of their lifetimes.

160. The 24 months of credit monitoring offered to persons whose Private Information was compromised is wholly inadequate as it fails to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity

theft and financial fraud. What's more, Defendants place the burden on Plaintiffs and Class Members by requiring them to expend time signing up for that service rather than automatically enrolling all victims of this Data Breach.

161.  Defendants' credit monitoring advice to Plaintiffs and Class Members places the burden on Plaintiffs and Class Members, rather than on Defendants, to investigate and protect themselves from Defendants' tortious acts resulting in the Data Breach.

162.  Plaintiffs and Class Members have been damaged by the compromise and exfiltration of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

163.  Plaintiffs' Private Information was compromised and exfiltrated by cyber-criminals as a direct and proximate result of the Data Breach.

164.  Plaintiffs and Class Members were damaged in that their Private Information is in the hands of cyber criminals.

165.  As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been placed at an actual, present, immediate, and continuing increased risk of harm from fraud and identity theft.

166.  As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach.

167.  Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

168.  Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential

fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

169. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

170. Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Many courts have recognized the propriety of loss of value damages in related cases.

171. Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial accounts and records for misuse.

172. Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.  Finding fraudulent charges;
    b.  Canceling and reissuing credit and debit cards;
    c.  Purchasing credit monitoring and identity theft prevention;
    d.  Addressing their inability to withdraw funds linked to compromised accounts;
    e.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;
    f.  Placing "freezes" and "alerts" with credit reporting agencies;
    g.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;
    h.  Contacting financial institutions and closing or modifying financial accounts;
    i.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;
    j.  Paying late fees and declined payment fees imposed because of failed automatic payments that were tied to compromised cards that had to be cancelled; and

k.   Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

173.   Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendants is protected from further breaches by implementing security measures and safeguards, including, but not limited to, making sure that the storage of data or documents containing personal and financial information is inaccessible online and that access to such data is password protected.

174.   Further, because of Defendants' conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information —which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

175.   As a direct and proximate result of Defendants' actions and inactions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## VIII.   CLASS REPRESENTATION ALLEGATIONS

176.   Plaintiffs bring this action on behalf of themselves individually and on behalf of all other persons similarly situated pursuant to Federal Rule of Civil Procedure 23.

177.   Plaintiffs propose the following Class definition, subject to amendment as appropriate:

**All persons whose Private Information was compromised because of the November 20, 2024 Data Breach (the "Class").**

178.   Excluded from the Class are Defendants' officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys,

successors, heirs, and assigns of Defendant. Excluded also from the Class are Members of the judiciary to whom this case is assigned, their families and Members of their staff.

179. Plaintiffs reserve the right to amend or modify the class definitions with greater specificity or division after having an opportunity to conduct discovery.

180. <u>Numerosity</u>. The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, based on information and belief including Defendants' reporting, the Class consists of at least 1,706 individuals whose Private Information was compromised in Data Breach.[41]

181. <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

      a.     Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

      b.     Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

      c.     Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

      d.     Whether Defendant's data security systems prior to and during the Data Breach adhered to industry standards;

      e.     Whether Defendant owed a duty to Class Members to safeguard their Private Information;

---

[41] US Department of Health and Human Services, Data Breaches Under Investigation: available at: https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited April 8, 2025).

f.      Whether Defendant breached their duty to Class Members to safeguard their Private Information;

g.      Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.      Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.      Whether Plaintiffs and Class Members suffered legally cognizable damages from Defendant's misconduct;

j.      Whether Defendant's conduct was negligent;

k.      Whether Defendant's conduct was per se negligent;

l.      Whether Defendants breached third-party beneficiary contracts for adequate data security with Class Members;

m.      Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

n.      Whether Defendant was unjustly enriched;

o.      Whether Defendant failed to provide notice of the Data Breach promptly; and

p.      Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

182. <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class member, was compromised in the Data Breach. Plaintiffs' claims are typical of those of the other Class Members because, among other things, all Class Members were injured through the common misconduct of Defendants. Plaintiffs are advancing the same claims and legal theories on behalf of himself and all other Class

Members, and no defenses are unique to Plaintiffs. Plaintiffs' claims and those of Class Members arise from the same operative facts and are based on the same legal theories.

183. <u>Adequacy</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's Counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

184. <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all Plaintiffs' and Class Members' data was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

185. <u>Superiority and Manageability</u>. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

186. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure

to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

187. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

188. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

189. Unless a Class-wide injunction is issued, Defendant may continue in their failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

190. Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

191. Likewise, particular issues are appropriate for certification under Rule 23(c)(4) FCRP because such claims present only particular, common issues, the resolution of which would

advance the disposition of this matter and the parties' interests therein. Such issues include, but are not limited to:

     a.    Whether Defendant failed to timely notify the public of the Data Breach;

     b.    Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

     c.    Whether Defendant's security measures to protect their data systems were reasonable considering best practices recommended by data security experts;

     d.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

     e.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer Private Information; and

     f.    Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

192.  Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendants.

## IX. CAUSES OF ACTION

### FIRST COUNT
### NEGLIGENCE
### (On Behalf of Plaintiffs and All Class Members)

193.  Plaintiffs re-allege and incorporates by reference paragraphs 1 through 190 as if fully set forth herein.

194. Defendants required Plaintiffs and Class Members to submit non-public personal information to obtain employment and/or employee benefits.

195. By collecting and storing this data in Defendants' computer property, and sharing it and using it for commercial gain, Defendants had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendants' duties included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

196. Defendants owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

197. Defendants' duty of care to use reasonable security measures arose because of the special relationship that existed between Defendants and Defendant Dollar Tree's current and former employees, which is recognized by laws and regulations, including, but not limited to, HIPAA, as well as common law. Defendants could have and should have ensured that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

198. Defendants' owed these duties to Plaintiffs and members of the Class because they are Members of a well-defined, foreseeable, and probable class of individuals who Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security protocols.

199. Defendants' duty to use reasonable security measures under HIPAA required Defendants to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all the medical information at issue constitutes "protected health information" within the meaning of HIPAA.

200. In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

201. Defendants' duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

202. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

    b.    Failing to adequately monitor the security of its networks and systems;

    c.    Failing to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

    d.    Allowing unauthorized access to Class Members' Private Information;

    e.    Failing to detect timely that Class Members' Private Information had been compromised;

f.  Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g.  Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

203.  It was foreseeable that Defendants' failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches targeting protected health information.

204.  It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

205.  Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

206.  Defendants' negligent conduct is ongoing, in that they still hold the Private Information of Plaintiffs and Class Members in an unsafe and unsecure manner.

207.  Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**SECOND COUNT**
**NEGLIGENCE PER SE**
**(On Behalf of Plaintiffs and All Class Members)**

208.  Plaintiffs re-allege and incorporate paragraphs 1 through 190 above as if fully set forth herein.

209.  Under the Federal Trade Commission Act, 15 U.S.C. § 45, Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

210.  Under HIPAA, 42 U.S.C. § 1302d, et seq., Defendants had a duty to implement reasonable safeguards to protect Plaintiff's and Class Members' Private Information.

211.  Under HIPAA, Defendants had a duty to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." See definition of encryption at 45 C.F.R. § 164.304. Defendants breached their duties to Plaintiffs and Class Members under the Federal Trade Commission Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

212.  Defendants breached their duties to Plaintiffs and Class Members under Federal and State law by failing to develop and implement policies and procedures necessary to protect Plaintiff's and Class Members' PHI.

213.  Defendants' failure to comply with applicable laws and regulations constitutes negligence *per se*.

214.  But for Defendants' wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

215.  The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that by failing to meet its duties, and that Defendants' breach would cause Plaintiffs and Class

Members to experience the foreseeable harms associated with the exposure of their Private Information.

216. As a direct and proximate result of Defendants' negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

### THIRD COUNT
### BREACH OF IMPLIED CONTRACT
#### (On Behalf of Plaintiffs and All Class Members)

217. Plaintiffs re-allege and incorporate the paragraphs 1 through 190 above allegations as if fully set forth herein.

218. When Plaintiffs and Class Members provided their Private Information to Defendants in exchange for employment and employee benefit services, they entered implied contracts with Defendant under which Defendant agreed to reasonably protect such information.

219. Defendants solicited, offered, and invited Plaintiffs and Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiffs and Class Members provided their Private Information to Defendants.

220. In entering such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and adhered to industry standards.

221. Plaintiffs and Class Members as employees earned profits on behalf of their employer Defendant Dollar Tree, with the reasonable belief and expectation that Defendant Dollar Tree would use part of its earnings to obtain adequate data security. Defendant failed to do so.

222. Plaintiffs and Class Members would not have entrusted their Private Information to Defendants in the absence of the implied contract between them and Defendants to keep their information reasonably secure. Plaintiffs and Class Members would not have entrusted their Private Information to Defendants in the absence of its implied promise to monitor its computer systems and networks to ensure that they adopted reasonable data security measures. Plaintiffs and Class Members fully and adequately performed their obligations under the implied contracts with Defendants.

223. Defendants breached the implied contracts with Class Members by failing to safeguard and protect their Private Information.

224. As a direct and proximate result of Defendants' breach of the implied contracts, Class Members sustained damages as alleged here, including the loss of the benefit of the bargain.

225. Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered because of the Data Breach.

226. Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**FOURTH COUNT**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**(On Behalf of Plaintiffs and Class Members)**

227. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 190 above as if fully set forth herein.

228. On information and belief, Defendant Lockton entered into contracts to provide services to its client (i.e. Defendant Dollar Tree), which services included employee-benefit management services, to the benefit of Benefits Recipients.

229. On information and belief, these contracts are virtually identical and were made expressly for the benefit of Plaintiff and Class Members, as it was their Private Information that Defendant Lockton agreed to receive and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiff and Class Members was the direct and primary objective of the contracting parties.

230. Defendant Lockton knew that if it were to breach these contracts with its clients, the clients' Benefit recipients, including Plaintiff and Class Members, would be harmed.

231. Defendant Lockton breach ed its contracts with its lients – whose benefit Recipients, including Plaintiff and Class Members – were affected by this Data Breach when it failed to use reasonable data security measures that could have prevented the Data Breach, and when it failed to timely notify Plaintiff and Class Members regarding the breach.

232. As foreseen, Plaintiff and Class members were harmed by Defendants' failure to use reasonable data security measures to store the Private Information that Plaintiff and Class Members provided to their employers who in turn provided that information to Defendants, and Defendants' failure to timely notify Plaintiff and Class Members, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

233. Accordingly, Plaintiff and Class Members are entitled to damages in an amount to be determined at trial, including actual, consequential, and nominal damages, along with costs and attorneys' fees incurred in this action.

**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and All Class Members)**

234. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 190 above as if fully set forth herein.

235. Defendant became guardian of Plaintiffs' and Class Members' Private Information, creating a special relationship between Defendant and Plaintiffs and Class Members.

236. As such, Defendant became a fiduciary by its undertaking and guardianship of the Private Information, to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and does store.

237. Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with its current and former members, in particular, to keep secure their Private Information.

238. Defendant breached its fiduciary duties by, inter alia, failing to comply with the guidelines outlined under HIPAA and the FTC act for safeguarding and storing it. This failure resulted in the Data Breach that ultimately came to pass.

239. Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

240. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to:

    a.     actual identity theft;
    b.     the compromise, publication, and/or theft of their Private Information;
    c.     out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information;
    d.     lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the consequences of the

Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft;

e. the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession;

f. future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the rest of the lives of Plaintiffs and Class Members; and

g. the diminished value of Defendant's services they received.

241. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

242. Plaintiffs and the Class seek compensatory damages for breach of fiduciary duty, which entails the amount of the difference between the price they paid for defendants' services as promised and the diminished value of its financial and insurance services and the costs of future monitoring of their credit history for identity theft  and fraud, and/or other damages, plus prejudgment interest and costs.

## FIFTH COUNT
## INVASION OF PRIVACY/INTRUSION UPON SECLUSION
### (On behalf of Plaintiffs and Class Members)

243. Plaintiffs re-allege and incorporate by refence paragraphs 1 through 190 above as if fully set forth herein.

244. Plaintiffs and Class Members had a legitimate expectation of privacy to their Private Information and were entitled to Defendants' protection of this Private Information in its possession against disclosure to unauthorized third parties.

245. Defendants owed a duty to Benefit Recipients, including Plaintiffs and Class Members, to keep their Private Information confidential and secure.

246. Defendants failed to protect Plaintiff's and Class Members' Private Information and instead exposed it to unauthorized persons, criminal hackers, which on information and belief have made or imminently will make the Private Information publicly available and disseminated it to thousands of people, including through publishing the data on dark web leak sites, where cybercriminals go to find their next identity theft and extortion victims.

247. Defendants allowed unauthorized third parties access to and examination of the Private Information of Plaintiffs and Class Members, by way of Defendants' failure to protect the Private Information through reasonable data security measures.

248. The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiffs and Class Members is highly offensive to a reasonable person and represents an intrusion upon Plaintiffs' and Class Members' seclusion as well as a public disclosure of private facts.

249. The intrusion was into a place or thing, which was private and is entitled to be private – sensitive and confidential information including financial account numbers and Social Security numbers.

250. Plaintiffs and Class Members disclosed their Private Information to Defendants as a condition of and in exchange for receiving services, but privately with an intention that the Private Information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and Class members were reasonable in their belief that such information would be kept private and not be disclosed without their authorization, given Defendants' promises to that effect.

251. Subsequent to the intrusion, Defendants permitted Plaintiffs' and Class Members' data to be accessed by hackers and, imminently if not already, published online to countless cybercriminals whose mission is to misuse such information through fraud and extortion.

252. The Data Breach constitutes an intentional or reckless interference by Defendants with Plaintiff's and Class Members' interests in solitude or seclusion, as to their person's or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

253. Defendants acted with a knowing state of mind when they permitted the Data Breach to occur because it had actual knowledge that its information security practices were insufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

254. Defendants acted with reckless disregard for Plaintiffs' and Class Members' privacy when they allowed improper access to its systems containing Plaintiffs' and Class Members' Private Information without protecting said data from the unauthorized disclosure, or even encrypting it.

255. Defendants were aware of the potential of a data breach and failed to adequately safeguard its network systems or implement appropriate policies to prevent the unauthorized release of Plaintiffs' and Class Members' Private Information to cybercriminals.

256. Because Defendants acted with this knowing state of mind, they had notice and knew that their inadequate and insufficient information security practices would cause injury and harm to Plaintiff and Class Members.

257. As a direct and proximate result of Defendants' acts and omissions set forth above, Plaintiffs' and Class Members' Private Information was disclosed to third parties without authorization, causing Plaintiffs and Class Members to suffer injuries and damages including, without limitation, (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) out-of-pocket and lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (d) emotional distress due to their Private Information's publication on the dark web; and the continued and

certainly increased risk to their Private Information, which remains in Defendants' possession in unencrypted form and subject to further unauthorized disclosures, so long as Defendants fail to undertake appropriate and adequate measures to protect it.

258.  Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that the Private Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiff and Class members.

**SIXTH COUNT**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and All Class Members)**

259.  Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 190 as if fully set forth herein.

260.  Plaintiffs bring this claim individually and on behalf of all Class Members. This count is pled in the alternative to the breach of contract count above.

261.  Upon information and belief, Defendants fund their data security measures entirely from their general revenue, including payments made by or on behalf of Plaintiffs and the Class Members.

262. Plaintiffs and Class members conferred a monetary benefit on Defendants. They provided services to Defendants and in so doing provided Defendants with their Private Information. In exchange, Plaintiffs and Class Members should have received from the Defendants their Private Information protected with adequate data security.

263. Defendants knew that Plaintiffs and Class Members conferred a benefit which Defendants accepted. Defendants profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

264. Defendants enriched itself by saving the costs Defendants reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Rather than providing a reasonable level of security that would have prevented the hacking incident, Defendants instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by using cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the requisite security.

265. Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

266. Defendants failed to secure Plaintiffs' and Class Members' Private Information and thus did not provide full compensation for the benefit Plaintiffs and Class Members provided.

267. Defendants acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices alleged.

268. If Plaintiffs and Class Members knew that Defendants had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

269. Plaintiffs and Class Members have no adequate remedy at law.

270. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to:

    a.    Actual identity theft;

    b.    The loss of the opportunity of how their Private Information is used;

    c.    The compromise, publication, and/or theft of their Private Information;

    d.    Out-of-Pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or theft of their Private Information;

    e.    Lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the consequenc3es of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from. Identity theft;

    f.    The continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate meaqsur3es to protect Private Information in its continued possession; and

    g.    Future costs in terms of time, effort and money to be expended to prevent, detect, contest, and repair the effect of the Private Information compromised because of the Data Breach for the rest of the lives of Plaintiffs and Class Members.

271. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

272. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

## X. PRAYER FOR RELIEF

273. WHEREFORE, Plaintiffs, on behalf of themselves and the Class described above seek the following relief:

    a.    For an Order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiffs and their counsel to represent the

Class, and finding that Plaintiffs are proper representatives of the Class requested herein;

b.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein relating to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

c.   For equitable relief compelling Defendant to use appropriate methods and policies related to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

d.   For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained because of Defendant's wrongful conduct;

e.   Ordering Defendant's to pay for not less than ten years of credit monitoring services for Plaintiffs and the Class;

f.   For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g.   For an award of punitive damages, as allowable by law;

h.   For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.   Pre- and post-judgment interest on any amounts awarded; and

j.    Any other relief that this court may deem just and proper.

# XI.    JURY TRIAL DEMANDED

274.    Plaintiffs demand a trial by jury on all claims so triable.

Dated: April 10, 2025                    Respectfully submitted,

                                         */s/John F. Garvey*
                                         John F. Garvey, #35879 (MO)
                                         Colleen Garvey, #72809 (MO)
                                         **STRANCH, JENNINGS & GARVEY, PLLC**
                                         701 Market Street, Suite 1510
                                         St. Louis, MO 63101
                                         Tel: (314) 390-6750
                                         jgarvey@stranchlaw.com
                                         cgarvey@stranchlaw.com

                                         J. Gerard Stranch, IV (TN BPR #23045)*
                                         Grayson Wells #73068 (MO)
                                         **STRANCH, JENNINGS, & GARVEY, PLLC**
                                         223 Rosa Parks Ave. Suite 200
                                         Nashville, TN 37203
                                         Telephone: 615/254-8801
                                         Facsimile: 615/255-5419
                                         gstranch@stranchlaw.com
                                         gwells@stranchlaw.com

                                         Leigh S. Montgomery*
                                         Texas Bar No. 24052214
                                         lmontgomery@eksm.com
                                         **EKSM, LLP**
                                         4200 Montrose, Ste. 200
                                         Houston, Texas 77006
                                         Phone: (888) 350-3931
                                         Service only: service@eksm.com

                                         **Attorneys for Plaintiffs and the Putative
                                         Class**

                                         (* denotes *pro hac vice* forthcoming)